Slip Op. 19-69

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **CONFEDERACIÓN DE ASOCIACIONES AGRÍCOLAS DEL ESTADO DE SINALOA, A.C., CONSEJO AGRÍCOLA DE BAJA CALIFORNIA, A.C., ASOCIACIÓN MEXICANA DE HORTICULTURA PROTEGIDA, A.C., ASOCIACIÓN DE PRODUCTORES DE HORTALIZAS DEL YAQUI Y MAYO, and SISTEMA PRODUCTO TOMATE,** | |
| **Plaintiffs,** | **Before: Jennifer Choe-Groves, Judge** |
| **v.** | **Court No. 19-00059** |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **THE FLORIDA TOMATO EXCHANGE,** | |
| **Defendant-Intervenor.** | |

## OPINION

[Denying Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction.]

Dated:  June 6, 2019

Neil H. Koslowe, Thomas B. Wilner, and Lisa Rainer, Shearman & Sterling LLP, of Washington, D.C., argued for Plaintiffs Confederación de Asociaciones Agrícolas del Estado de Sinaloa, A.C., Consejo Agrícola de Baja California, A.C., Asociación Mexicana de Horticultura Protegida, A.C., Asociación de Productores de Hortalizas del Yaqui y Mayo, and Sistema Producto Tomate.  With them on the brief was Robert S. LaRussa.

Elizabeth A. Speck and Joshua E. Kurland, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., argued for Defendant United States.  With them on the brief was Joseph H. Hunt, Assistant Attorney General.  Of counsel was James H. Ahrens, II, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Jonathan M. Zielinski, Cassidy Levy Kent (USA) LLP, of Washington, D.C., argued for The Florida Tomato Exchange.  With him on the brief were Robert C. Cassidy, Jr., Charles S. Levy, and James R. Cannon, Jr.

Choe-Groves, Judge:  Plaintiffs Confederación de Asociaciones Agrícolas del Estado de

Sinaloa, A.C. ("CAADES"), Consejo Agrícola de Baja California, A.C. ("CABC"), Asociación

Mexicana de Horticultura Protegida, A.C. ("AMHPAC"), Asociación de Productores de

Hortalizas del Yaqui y Mayo ("APHYM"), and Sistema Producto Tomate ("SPT") (collectively,

"Plaintiffs"), brought this action on May 9, 2019, related to the Department of Commerce's

("Commerce") withdrawal from a suspension agreement and subsequent continuation of an

antidumping duty investigation.  Summons, May 9, 2019, ECF No. 1; Compl., May 9, 2019,

ECF No. 2.  For the reasons that follow, Plaintiffs' motion for a Temporary Restraining Order

("TRO") and Preliminary Injunction ("PI") is denied.

## BACKGROUND

Commerce initiated an antidumping duty investigation on April 18, 1996 into fresh

tomatoes from Mexico to determine whether imports of fresh tomatoes were, or were likely to

be, sold in the United States at less than fair value ("LTFV").  Initiation of Antidumping Duty

Investigation: Fresh Tomatoes from Mexico, 61 Fed. Reg. 18,377 (Dep't Commerce Apr. 25,

1996).  The U.S. International Trade Commission completed an investigation and issued an

affirmative preliminary injury determination on May 16, 1996.  Fresh Tomatoes from Mexico,

USITC Pub. 2967, Inv. No. 731-TA-747 (May 1996) (Preliminary), available at

https://www.usitc.gov/publications/701_731/PUB2967.pdf (last visited Jun. 6, 2019).

Commerce issued an affirmative preliminary determination on October 28, 1996, finding that

imports of fresh tomatoes from Mexico were being sold at LTFV in the United States.  Notice of

Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final

Determination: Fresh Tomatoes From Mexico, 61 Fed. Reg. 56,608 (Dep't Commerce Nov. 1,

1996) ("Fresh Tomatoes From Mexico Preliminary Determination").  On the same day,

Commerce signed an agreement with producers, who accounted for substantially all imports of

fresh tomatoes from Mexico, and suspended the antidumping duty investigation.  See Suspension

of Antidumping Investigation: Fresh Tomatoes from Mexico, 61 Fed. Reg. 56,618 (Dep't

Commerce Nov. 1, 1996).

        Over the next twenty-three years, Commerce and producers of fresh tomatoes from

Mexico entered into a series of agreements that suspended the 1996 antidumping duty

investigation.  See Fresh Tomatoes From Mexico: Termination of Suspension Agreement,

Rescission of Administrative Review, and Continuation of the Antidumping Duty Investigation,

84 Fed. Reg. 20,858 (Dep't Commerce May 13, 2019) ("Termination of Suspension Agreement,

Rescission of Administrative Review, and Continuation of the Antidumping Duty

Investigation").  The most recent of these agreements entered into force on March 4, 2013.

Fresh Tomatoes From Mexico: Suspension of Antidumping Investigation, 78 Fed. Reg. 14,967

(Dep't Commerce Mar. 8, 2013) ("2013 Suspension Agreement").

        The 2013 Suspension Agreement provided that any party may withdraw from the

Agreement upon 90 days' written notice.  2013 Suspension Agreement at 14,971.  Commerce

provided written notice of its intent to withdraw from the 2013 Suspension Agreement on

February 6, 2019.  Letter from P. Lee Smith, Deputy Assistant Secretary for Policy &

Negotiations, Enforcement & Compliance, U.S. Department of Commerce to Signatories to the

2013 Suspension Agreement on Fresh Tomatoes from Mexico (Feb. 6, 2019), Attachment A,

May 14, 2019, ECF No. 22–1.

Commerce provided notice of its intent to continue the suspended antidumping duty

investigation on May 7, 2019, which was published in the Federal Register on May 13, 2019.

Termination of Suspension Agreement, Rescission of Administrative Review, and Continuation

of the Antidumping Duty Investigation, 84 Fed. Reg. 20,858 (Dep't Commerce May 13, 2019).

Plaintiffs brought the present action and moved for a TRO and PI on May 9, 2019.

Summons, May 9, 2019, ECF No. 1; Compl., May 9, 2019, ECF No. 2; Pls.' Mot. for TRO and

PI Against Defendant, May 9, 2019, ECF No. 8.  Plaintiffs' TRO and PI motion seeks to enjoin

Commerce from (1) "ordering a suspension of the liquidation of entries of fresh tomatoes from

Mexico," (2) "resuming its antidumping investigation into those tomatoes," and (3) "instructing

the U.S. Customs and Border Protection to require a cash deposit or bond for each entry of those

tomatoes, pending the Court's disposition of this civil action."  Pls.' Mot. for TRO and PI

Against Defendant, May 9, 2019, ECF No. 8; Pls.' Mem. in Support of Mot. for TRO and PI,

May 9, 2019, ECF No. 9 ("Pls.' Mem.").  The court expedited briefing on the TRO and PI

motion and requested supplemental briefing on subject-matter jurisdiction on May 10, 2019.

Order, May 10, 2019, ECF No. 13.

The Florida Tomato Exchange ("FTE") moved to intervene on May 10, 2019.  Partial

Consent Mot. to Intervene as a Matter of Right, May 10, 2019, ECF No. 14.  The court permitted

FTE to intervene as a Defendant-Intervenor under USCIT Rule 24(b).  Order, May 10, 2019,

ECF No. 18.

Defendant and FTE responded on May 14, 2019.  Def.'s Resp. to Pls.' Mot. for TRO and

PI, May 14, 2019, ECF No. 22 ("Def.'s Resp."); Resp. of the FTE to Pls.' Mot. for a TRO and

PI, May 14, 2019, ECF No. 21 ("FTE's Resp."). Plaintiffs replied on May 15, 2019. Pls.' Mem.

in Reply to Def.'s and Intervenor's Opp'ns to Pls.' Mot. for TRO and PI, May 15, 2019, ECF

No. 23 ("Pls.' Reply"). Plaintiffs filed an Amended Complaint on May 15, 2019. Am. Compl.,

May 15, 2019, ECF No. 24 ("Am. Compl.").

The court held a TRO and PI Hearing on May 16, 2019. Hearing, May 16, 2019, ECF

No. 25. Plaintiffs, Defendant, and Defendant-Intervenor provided supplemental briefing and

exhibits on May 17, 2019. Pls.' Post-Hr'g Mem., May 17, 2019, ECF No. 29; Pls.' Post-Hr'g

Mem., May 17, 2019, ECF No. 27; Def.'s Suppl. Br., May 17, 2019, ECF No. 28 ("Def.'s Suppl.

Br."); Suppl. Br. FTE, May 17, 2019, ECF No. 26. Defendant moved to strike Plaintiffs' post-

hearing briefs and Plaintiffs' supplement exhibit numbers 8 through 14 on May 20, 2019. Def.'s

Mot. to Strike Portions of Pls.' Post-Hr'g Mem., or Alternatively for Leave to File a Sur-Reply to

Pls.' Mem., May 20, 2019, ECF No. 30. The court denied Defendant's motion to strike. Order,

May 20, 2019, ECF No. 31. Plaintiffs filed a supplemental memorandum on May 28, 2019.

Pls.' Emergency Supplemental Memorandum, May 28, 2019, ECF No. 33 ("Pls.' Suppl. Mem.").

Defendant responded. Def.'s Resp. to Pls.' Emergency Suppl. Mem., May 29, 2019, ECF No. 34

("Def.'s Suppl. Mem. Resp."). Plaintiffs replied. Pls.' Reply to Def.'s Resp. to Pls.' Emergency

Suppl. Mem., May 30, 2019, ECF No. 35.

**DISCUSSION**

## I.    Subject-Matter Jurisdiction

The U.S. Court of International Trade, like all federal courts, is one of limited jurisdiction

and is "presumed to be 'without jurisdiction' unless 'the contrary appears affirmatively from the

record.'" DaimlerChrysler Corp. v. United States, 442 F.3d 1313, 1318 (Fed. Cir. 2006)

(quoting King Iron Bridge & Mfg. Co. v. Otoe Cty., 120 U.S. 225, 226 (1887)). The Court is

empowered to hear civil actions brought against the United States pursuant to the specific grants

of jurisdiction enumerated under 28 U.S.C. §§ 1581(a)–(i) (2012).  The party invoking

jurisdiction must allege sufficient facts to establish the court's jurisdiction, id. (citing McNutt v.

Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936)), and therefore bears the

burden of establishing it.  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).

      Plaintiffs plead jurisdiction under 28 U.S.C. §§ 1581(i)(2) and (4).  Am. Compl.

¶ 2.  Under 28 U.S.C. § 1581(i), the Court has exclusive jurisdiction over:

> any civil action commenced against the United States, its agencies, or its officers,
> that arises out of any law of the United States providing for— . . .
>
> > (2) tariffs, duties, fees or other taxes on the importation of merchandise for
> > reasons other than the raising of revenue; . . . [and]
> >
> > (4) administration and enforcement with respect to the matters referred to
> > in paragraphs (1)–(3) of this subsection and subsections (a)–(h) of this
> > section.

28 U.S.C. § 1581(i).  The court's residual jurisdiction under 28 U.S.C. § 1581(i) may not be

invoked when jurisdiction under another subsection of § 1581 is or could have been available,

unless the remedy provided under that other subsection would be manifestly inadequate.  Ford

Motor Co. v. United States, 688 F.3d 1319, 1323 (Fed. Cir. 2012).

      When determining jurisdiction, the court looks to the true nature of the action.  Hartford

Fire Ins. Co. v. United States, 544 F.3d 1289, 1293 (Fed. Cir. 2008).  The true nature of an action

depends on the facts asserted in the pleadings.  Hutchison Quality Furniture, Inc. v. United

States, 827 F.3d 1355, 1360 (Fed. Cir. 2016).  To determine the true nature of an action, the

court identifies the particular agency action that is the source of the alleged harm, which in turn

identifies the subsection of 28 U.S.C. § 1581 that provides the appropriate vehicle for judicial

review.  Id.

Plaintiffs do not explicitly identify a subsection of 28 U.S.C. § 1581 that would form the

predicate for 28 U.S.C. § 1581(i) jurisdiction, so the court examines the facts and claims alleged

by the Plaintiffs.  See Pls.' Reply 11.

The Amended Complaint's factual statement begins with the 1996 investigation into

Fresh Tomatoes from Mexico.  See Am. Compl. ¶ 6 (citing Initiation of Antidumping Duty

Investigation: Fresh Tomatoes from Mexico, 61 Fed. Reg. 18,377 (Dep't Commerce Apr. 25,

1996)).  Plaintiffs' factual statement then addresses the 2013 Suspension Agreement and

Commerce's withdrawal from the 2013 Suspension Agreement.  Id. at ¶¶ 7–17.  Plaintiffs allege

that Commerce is not authorized by 19 U.S.C. § 1673c(i) and the statute's implementing

regulations to (1) "order[] a suspension of the liquidation of unliquidated entries of fresh

tomatoes from Mexico," (2) "resum[e] the antidumping duty investigation into fresh tomatoes

from Mexico that [Commerce] initiated in 1996 'as if' it were based on a preliminary

determination made on May 7, 2019," and (3) "instruct[] the U.S. Customs and Border

Protection . . . to require a cash deposit or bond for each entry of fresh tomatoes from Mexico,"

and that Commerce's actions are "void *ab initio*."  See Am. Compl. at ¶ 16; Pls.' Reply 11; see

also TRO and PI Hr'g Oral Argument at 2:42:53–2:43:22, 3:01:02–3:02:30.  Defendant counters

that Commerce's actions are permitted by the statutes governing an antidumping investigation,

and Plaintiffs may challenge Commerce's actions following the final determination pursuant to

28 U.S.C. § 1581(c).  Def.'s Resp. 10, 17; see also TRO and PI Hr'g Oral Argument at 3:05:20;

FTE's Resp. 7–13.

The court concludes that the facts and allegations in Plaintiffs' Amended Complaint

indicate that the particular agency action at issue is Commerce's withdrawal from the 2013

Suspension Agreement.  For the purpose of assessing jurisdiction under 28 U.S.C. § 1581(i), the

court determines that the true nature of Plaintiffs' action pertains to administration and enforcement of a matter described in 28 U.S.C. § 1581(c).

### A.  Availability of 28 U.S.C. § 1581(c)

The court considers whether jurisdiction under 28 U.S.C. § 1581(c) is or could be available in the present action.  See Ford, 688 F.3d at 1323.  Plaintiffs argue that jurisdiction under section 1581(c) is not available.  See TRO and PI Hr'g Oral Argument at 17:30–19:10; Pls.' Reply 12 ("Given the true nature of CAADES' lawsuit, the only statute that confers jurisdiction on this Court is 28 U.S.C. § 1581(i)."); see also Am. Compl. ¶¶ 1–2 (asserting jurisdiction under 28 U.S.C. § 1581(i) without elaboration).  Defendant counters that jurisdiction under section 1581(c) is not yet available and that jurisdiction will be available to Plaintiffs' challenges "when Commerce completes its resumed investigation."  Def.'s Resp. 7.  Defendant-Intervenor argues that Plaintiffs do not show that jurisdiction under 19 U.S.C. § 1581(c) is either unavailable or inadequate.  See FTE Resp. 7–9.

Under 28 U.S.C. § 1581(c), the U.S. Court of International Trade has exclusive jurisdiction over any civil action commenced under 19 U.S.C. § 1516a.  See 28 U.S.C. § 1581(c). In the context of a suspension agreement, 19 U.S.C. § 1516a identifies three determinations subject to judicial review: (1) the determination to suspend an antidumping duty investigation, (2) the final determination of a continued investigation, and (3) an injurious effect determination. 19 U.S.C. §§ 1516a(a)(2)(B)(iv) & (v).  The determination to withdraw from a suspension agreement is not specifically provided for in 19 U.S.C. § 1516a.  See 19 U.S.C. § 1516a.

The court concludes that jurisdiction under 28 U.S.C. § 1581(c) is unavailable in the context of Plaintiffs' present action arising out of the 2013 Suspension Agreement because (i) Plaintiffs challenge the legality of specific Commerce instructions following the withdrawal

from a suspension agreement, (ii) 19 U.S.C. § 1516a does not identify Commerce's decision to

withdraw from a suspension agreement as reviewable, and (iii) Plaintiffs do not directly

challenge an identified determination reviewable under 19 U.S.C. § 1516a.

### B.  Jurisdiction Under 28 U.S.C. § 1581(i)

Plaintiffs' complaint challenges (1) the "suspension of the liquidation of unliquidated

entries of fresh tomatoes from Mexico," (2) the "resum[ption of] the antidumping duty

investigation into fresh tomatoes from Mexico that [Commerce] initiated in 1996 'as if' it were

based on a preliminary determination made on May 7, 2019," and (3) Commerce's "instruct[ions

to] the U.S. Customs and Border Protection . . . to require a cash deposit or bond for each entry

of fresh tomatoes from Mexico."  Am. Compl. ¶ 1.  The court determines that Plaintiffs' first and

third challenged actions (the suspension of liquidation and the instructions requiring a cash

deposit or bond) arise out of a duty on the importation of merchandise for a reason other than the

raising of revenue, *i.e.*, the continued antidumping investigation.  See Termination of Suspension

Agreement, Rescission of Administrative Review, and Continuation of the Antidumping Duty

Investigation at 20,860.  The court determines that all three challenged actions pertain to the

administration and enforcement of a matter referred to in 28 U.S.C. § 1581(c), *i.e.*, actions

leading to a final determination from a continued investigation.  See 19 U.S.C.

§ 1516a(a)(2)(B)(iv).  The court concludes that subject-matter jurisdiction exists over this action

under 28 U.S.C. § 1581(i).

### II.     Exhaustion of Administrative Remedies

Because the court has jurisdiction under 28 U.S.C. § 1581(i) and in light of Plaintiffs'

motion for emergency injunctive relief in this action, the court exercises its discretion to waive

the exhaustion of administrative remedies pursuant to 28 U.S.C. § 2637.  See 28 U.S.C.

§ 2637(d).

### III.    Plaintiffs' Motion for TRO and PI

USCIT Rule 65 allows for a court to grant injunctive relief in an action.  USCIT R. 65; 28

U.S.C. § 2643.  The court considers four factors when evaluating whether to grant a temporary

restraining order or preliminary injunction: (1) whether the party will incur irreparable harm in

the absence of such injunction; (2) whether the party is likely to succeed on the merits of the

action; (3) whether the balance of hardships favors the imposition of the injunction; and

(4) whether the injunction is in the public interest.  See Winter v. Nat. Res. Def. Council, Inc.,

555 U.S. 7, 20 (2008); see also Wind Tower Trade Coal. v. United States, 741 F.3d 89, 95 (Fed.

Cir. 2014).  No one factor is necessarily dispositive because the weakness regarding one factor

may be overborne by the strength of the others.  Belgium v. United States, 452 F.3d 1289, 1292–

93 (Fed. Cir. 2006) (quoting FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993)).

### A.   Likelihood of Success on the Merits

Plaintiffs contend that pursuant to 19 U.S.C. § 1673c(i) and the statute's implementing

regulations, Commerce may not (1) suspend liquidation on entries of fresh tomatoes from

Mexico, (2) resume the antidumping duty investigation "as if" the preliminary determination had

been made on May 7, 2019, and (3) require cash deposits or bonds.  See Am. Compl. ¶¶ 1, 16;

Pls.' Reply 1, 23; see also TRO and PI Hr'g Oral Argument at 2:42:53–2:43:22, 3:01:02–

3:02:30.  In order to succeed on the merits, Plaintiffs must establish that: (1) Commerce took

these actions pursuant to 19 U.S.C. § 1673c(i), (2) Commerce's actions were not taken under the

authority of 19 U.S.C. § 1673b (preliminary determinations) and 19 U.S.C. § 1673d (final

determinations), and (3) that Commerce's actions were not permitted pursuant to 19 U.S.C.

§ 1673c(i).  See Pls.' Mem. 1.

First, Plaintiffs are unlikely to be able to establish that Commerce's instructions were

issued under the authority of 19 U.S.C. § 1673c(i), which is a provision relating to violations of a

suspension agreement.  Plaintiffs assert that the Government must have issued its instructions

pursuant to the violation provisions in 19 U.S.C. § 1673c(i), despite the Government's denial of

this assertion.  Defendant states that Commerce withdrew from the 2013 Suspension Agreement

pursuant to Section VI.B of the 2013 Suspension Agreement.  Def.'s Suppl. Br. 4; see also

Termination of Suspension Agreement, Rescission of Administrative Review, and Continuation

of the Antidumping Duty Investigation at 20,861.  Plaintiffs do not contest that Commerce may

withdraw from the 2013 Suspension Agreement pursuant to Section VI.B of the 2013 Suspension

Agreement,[1] but assert that 19 U.S.C. § 1673c(i) must be the apparent basis for Commerce's

actions because: (1) Commerce cited Section 734(i)(1)(B) of the Tariff Act of 1930, which is

codified as 19 U.S.C. § 1673c(i)(1)(B), "for guidance" and Commerce states that its actions are

"[c]onsistent with Section 734(i)(1)(B)," and (2) Plaintiffs argue that the Government

"pretend[ed]" to have made a preliminary determination as of May 7, 2019, when Commerce

withdrew from the 2013 suspension agreement.  See Termination of Suspension Agreement,

---

[1]      Judge:  Do you believe that there is a basis for any party to withdraw from the
Suspension Agreement, just on voluntary withdrawal?
         Mr. Koslowe:  Yes, there is.  And we don't challenge that.  The Agreement itself says on
90 days written notice either side can withdraw.
         Judge:  And there doesn't have to be a violation, or—?
         Mr. Koslowe:  Nope.
         Judge:—a finding that it doesn't meet the requirements of the Act?
         Mr. Koslowe:  No.

TRO and PI Hr'g Oral Argument at 10:05–10:30.

Rescission of Administrative Review, and Continuation of the Antidumping Duty Investigation

at 20,861; Pls.' Suppl. Mem. 2–5.

It is unlikely that Plaintiffs will succeed on the merits in this action.  The court finds that

the stated basis for Commerce's withdrawal from the 2013 Suspension Agreement is the

voluntary withdrawal provision with 90 days' notice, and that Commerce did not withdraw from

the 2013 Suspension Agreement due to a perceived violation of the 2013 Suspension Agreement.

The court also finds that a preliminary determination was made in 1996 when Commerce

issued an affirmative preliminary determination decision pursuant to 19 U.S.C. § 1673b, finding

that imports of fresh tomatoes from Mexico were being sold at LTFV in the United States.  Fresh

Tomatoes From Mexico Preliminary Determination at 56,608.  Because Commerce did not cite

19 U.S.C. § 1673c(i) as the authority for its actions and Commerce's actions could be based on

an affirmative preliminary determination issued pursuant to 19 U.S.C. § 1673b, the court

concludes that Plaintiffs are unlikely to be able to prove the first necessary finding, that

Commerce took these actions pursuant to 19 U.S.C. § 1673c(i).

Second, Plaintiffs are unlikely to be able to establish that Commerce's actions were not

taken under the authority of 19 U.S.C. § 1673b (preliminary determinations) and 19 U.S.C.

§ 1673d (final determinations).  See 19 U.S.C. §§ 1673b, 1673d.  The court has already

addressed that an affirmative preliminary determination was noticed pursuant to 19 U.S.C.

§ 1673b in 1996.  See Fresh Tomatoes From Mexico Preliminary Determination at 56,608.

Regarding Plaintiffs' challenge to Commerce's suspension of liquidation on entries of fresh

tomatoes from Mexico, the court notes that following an affirmative preliminary determination

from both the ITC and Commerce, 19 U.S.C. § 1673b requires Commerce to "order the

suspension of liquidation of all entries of merchandise subject to the determination."  19 U.S.C.

§ 1673b(d)(2).  Plaintiffs challenge Commerce's resumption of the antidumping duty

investigation "as if" the preliminary determination had been made on May 7, 2019.  Under 19

U.S.C. § 1673d, Commerce is required to proceed toward the issuance of a final determination

following an affirmative preliminary determination.  19 U.S.C. § 1673d(a)(1) ("Within 75 days

after the date of its preliminary determination . . . the administering authority shall make a final

determination.").  Plaintiffs' claim overlooks the fact that the 1996 Preliminary Determination

was noticed on the same day as the 1996 Suspension Agreement, and that Commerce's schedule

for issuance of a final determination is explicitly based on Commerce's schedule as set forth in

the 1996 Preliminary Determination:

> As explained in its 1996 Preliminary Determination, Commerce previously
> postponed the final determination until the 135th day after the date of the
> preliminary determination.  Commerce, therefore, intends to issue its final
> determination in the investigation 135 days after the effective date of withdrawal
> from and termination of the 2013 Agreement.

Termination of Suspension Agreement, Rescission of Administrative Review, and Continuation

of the Antidumping Duty Investigation at 20,860.  Plaintiffs also challenge Commerce's

instructions requiring a cash deposit or bond.  The court notes that under 19 U.S.C. § 1673b,

Commerce must "order the posting of a cash deposit, bond, or other security."  19 U.S.C.

§ 1673b(d)(1)(B).  The court concludes that each of Commerce's actions challenged by Plaintiffs

are mandated actions required by statute following a preliminary determination.

     Third, as each of Commerce's actions challenged by Plaintiffs are required by 19 U.S.C.

§§ 1673b and 1673d, Plaintiffs' claims are likely to fail on the merits before the court reaches the

issue of whether Commerce's actions were permitted pursuant to 19 U.S.C. § 1673c(i).

     Because Commerce is required to take each of the actions challenged by Plaintiffs

following an affirmative preliminary determination, the court determines that Plaintiffs have not

met their burden to establish a likelihood of success on the merits.  The likelihood of success on

the merits weighs against the issuance of a TRO or PI.

### B.  Irreparable Harm Absent Immediate Relief

Plaintiffs must show that they will suffer irreparable harm absent a grant of injunctive

relief. See Winter, 555 U.S. at 20.  Irreparable harm includes "a viable threat of serious harm

which cannot be undone."  Zenith Radio Corp. v. United States, 710 F.2d 806, 809 (Fed. Cir.

1983) (internal citations omitted).  An allegation of financial loss alone generally does not

constitute irreparable harm if future money damages can provide adequate corrective relief.  See

Sampson v. Murray, 415 U.S. 61, 90 (1974).  Bankruptcy or substantial loss of business may

constitute irreparable harm because "loss of business renders a final judgment ineffective,

depriving the movant of meaningful judicial review."  Harmoni Int'l Spice, Inc. v. United States,

41 CIT __, __, 211 F. Supp. 3d 1298, 1307 (2017) (citing Doran v. Salem Inn, Inc., 422 U.S.

922, 932 (1975)).  "Price erosion, loss of goodwill, damage to reputation, and loss of business

opportunities" may also constitute irreparable harm.  See Celsis In Vitro, Inc. v. CellzDirect,

Inc., 664 F.3d 922, 930 (Fed. Cir. 2012).  The showing of irreparable harm must be concrete and

more than merely speculative.

Plaintiffs argue that they will suffer irreparable harm in the form of lost sales, loss of

goodwill, and loss of business opportunities.  See Pls.' Mem. 7.  Plaintiffs contend that Mexican

tomato growers "stand to lose half their exports" which represent "sales and customers that the

Mexican [tomato] [g]rowers cannot retrieve," and that "[e]ven if the Mexican [tomato] [g]rowers

ultimately . . . recover the cash deposits," the Mexican tomato growers "will never recover the

lost sales revenue and may never recover lost partners and customers."  See id.  Plaintiffs'

arguments regarding irreparable harm proffer that a reduction in imports of fresh tomatoes from

Mexico would have a disruptive effect on the supply chain of fresh tomatoes, and that Plaintiffs

will incur a "significant burden" due to Commerce's requirement to submit data pertaining to the

continued investigation in a few weeks as compared to several months.  Id. at 7–8.  In support,

Plaintiffs offered, *inter alia*, testimonial and documentary evidence, including: the declaration

and testimony of Mr. A. Martin Ley, declarations of certain Plaintiffs and industry participants,

two declarations of Plaintiffs' counsel, Mr. Neil Koslowe, a memorandum from Dr. Timothy J.

Richards, a University of Arizona study summary, a letter to the Department of Commerce's

Secretary Wilbur Ross from a Mexican government official, a news article, documentary

submissions relating to the 2013 Suspension Agreement, and documents pertaining to

Commerce's continued investigation into fresh tomatoes from Mexico.[2]

---

[2] See Ley Decl., May 15, 2019, ECF No. 23–1 ("Ley Decl."); Diaz Decl., May 17, 2019, ECF No. 27–1 ("Diaz Decl."); Escalante Decl., May 17, 2019, ECF No. 27–2 ("Escalante Decl."); Valdez Decl., May 17, 2019, ECF No. 27–3 ("Valdez Decl."); Ureta Decl., May 17, 2019, ECF No. 27–4 ("Ureta Decl."); Mojardin Decl., May 17, 2019, ECF No. 27–5 ("Mojardin Decl."); Manson Decl., May 17, 2019, ECF No. 27–6 ("Manson Decl."); Chamberlain Decl., May 17, 2019, ECF No. 27–7 ("Chamberlain Decl."); Koslowe Decl., May 9, 2019, ECF No. 10 ("Koslowe Decl. (May 9, 2019)"); Koslowe Decl., May 28, 2019, ECF No. 33–1 ("Koslowe Decl. (May 28, 2019)"); Mem. from Dr. Timothy J. Richards, PhD, Badger Metrics, LLC, to Lance Jungmeyer, Fresh Produce Association of the Americas (Apr. 22, 2019) ("Richards Mem."), Koslow Decl. (May 9, 2019) Ex. 1, May 9, 2019, ECF No. 10–1; Dari Duval, Ashley K. Bickel, & George Fisvold, Mexican Fresh Tomatoes: Agribusiness Value Chain Contributions to the U.S. Economy, Dep't of Agricultural & Resource Economics, University of Arizona Cooperative Extension (Nov. 2018), Koslowe Decl. (May 9, 2019) Ex. 2, May 9, 2019, ECF No. 10–2 ("University of Arizona Study Summary"); Rajesh Kumar Singh, A tax on a tax: U.S. customs demands bigger bonds as trade tariffs rise, Reuters, Mar. 29, 2019, Pls.' Reply, Ex. 1, May 15, 2019, ECF No. 23–2; letter from Robert S. LaRussa and Thomas B. Wilner, counsel for CAADES, CABC, AMHPAC, UARS, and CNPH, to Hon. Wilbur Ross, Secretary of Commerce (Dec. 5, 2017), Pls.' Post-Hr'g Mem. Ex. 8, May 17, 2019, ECF No. 27–8; letter from Robert S. LaRussa, counsel for CAADES, CABC, AMHPAC, APHYM, and SPT to Hon. Wilbur Ross, Secretary of Commerce (Jul. 13, 2018), Pls.' Post-Hr'g Mem. Ex. 9, May 17, 2019, ECF No. 27–9; letter from Robert S. LaRussa, counsel for CAADES, CABC, AMHPAC, APHYM, and SPT to Hon. Wilbur Ross, Secretary of Commerce (Jul. 16, 2018), Pls.' Post-Hr'g Mem. Ex. 10, May 17, 2019, ECF No. 27–10; letter from Robert S. LaRussa, counsel for CAADES, CABC, AMHPAC, APHYM, and SPT to Hon. Wilbur Ross, Secretary of Commerce (Nov. 26, 2018), Pls.' Post-Hr'g Mem. Ex. 11, May 17, 2019, ECF No. 27–11; U.S. Dep't of Agriculture,

Defendant and Defendant-Intervenor counter that Plaintiffs have not demonstrated immediate, irreparable harm and challenge Plaintiffs' evidence as speculative and unsupported. Def.'s Resp. 10–11; see also FTE's Resp. 16–18.

First, the court considers Plaintiffs' assertions of lost sales and loss of export volume. Plaintiffs submitted, *inter alia*, the declaration and testimony of Mr. Ley, who was subject to cross-examination, and the declaration of Mr. Ureta.  Mr. Ley testified that Mexican tomato growers would experience lost sales.  See TRO and PI Hr'g Oral Argument at 39:25–41:18.  The court found Mr. Ley's testimony as a fact witness to be credible based on his demeanor and his experience in the fresh tomato industry.  See TRO and PI Hr'g Oral Argument at 34:20; Ley Decl. ¶¶ 1–2.  Mr. Ley explained that following Commerce's withdrawal from the 2013 Suspension Agreement, the fresh tomato import/export industry has experienced difficulty servicing contracts, keeping contracts in place, filling orders, and providing tomatoes.  See TRO and PI Hr'g Oral Argument at 38:58–39:14; Ley Decl. ¶¶ 1–2.  Mr. Ley added that 35 percent of Mexican tomato growers were ending the growing season early and 20 percent of Mexican tomato growers were shifting from tomatoes to other crops.  See Ley Decl. ¶ 5.  Mr. Ley stated

---

Agricultural Marketing Service Shipping-Point Data for Roma Tomatoes Imported 2013-2018, Pls.' Post-Hr'g Mem. Ex. 12, May 17, 2019, ECF No. 27–12; letter from Robert S. LaRussa, counsel for CAADES, CABC, AMHPAC, APHYM, and SPT to Hon. Wilbur Ross, Secretary of Commerce (Nov. 28, 2018), Pls.' Post-Hr'g Mem. Ex. 13, May 17, 2019, ECF No. 27–13; Mem. to File from P. Lee Smith, Deputy Assistant Secretary for Policy & Negotiations, Enforcement & Compliance, Pls.' Post-Hr'g Mem. Ex. 14, May 17, 2019, ECF No. 27–14; letter from Thomas B. Wilner, counsel for CAADES, CABC, AMHPAC, APHYM, and SPT to Hon. Wilbur Ross, Secretary of Commerce (May 15, 2019), Pls.' Suppl. Mem. Ex. 1, May 28, 2019, ECF No. 33–2; Mem. from Jacob Keller and Yang J. Chun, International Trade Compliance Analysts, to Gary Taverman, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations (May 24, 2019), Pls.' Suppl. Mem. Ex. 2, May 28, 2019, ECF No. 33–3; and letter from Minoo Hatten, Program Manager, Antidumping/Countervailing Duty Operations, International Trade Administration, U.S. Dep't of Commerce, to Bioparques De Occidente, S.A. de C.V., Ceuta Produce, S.A. de C.V., Negocio Agricola San Enrique, S.A. de C.V. (May 24, 2019), Pls.' Suppl. Mem. Ex. 3, May 28, 2019, ECF No. 33–4.

that as a result of the early end of the tomato harvest and the shift to other crops, tomato growers would suffer lost sales and Mexican employees would lose their jobs.  <u>See</u> Ley Decl. ¶ 6.  Mr. Ureta, the President of SPT, stated that many of SPT's members have not been able to post the required bonds and many of SPT's members "have given up on selling to the U.S. market" due to the cash deposit requirement.  Ureta Decl. ¶¶ 1–2.[3]

Plaintiffs' business decisions to forgo selling in the United States market, end their growing season, or switch production to other agricultural crops are insufficient evidence to establish irreparable harm in this action.  <u>Compare</u> <u>Corus Group PLC v. Bush</u>, 26 CIT 937, 944, 217 F. Supp. 2d 1347 (2002) (considering the argument that "sound business principles would require it to close . . . rather than operate at a loss" and finding insufficient evidence of the danger of imminent closure) <u>with</u> <u>U.S. Auto Parts Network, Inc. v. United States</u>, 42 CIT __, __, 319 F. Supp. 3d 1303, 1308 (2018) (finding irreparable harm when Plaintiff's financial records demonstrated the company would have been able to meet a bond requirement for "at best, a couple weeks" before going out of business).

The court finds that Plaintiffs' evidence concerning lost sales is supported by mere generalized statements as to trends in the industry and estimated percentages of growers, importers, and exporters affected, and that Plaintiffs' evidence regarding lost sales is unspecific and inconclusive as to the immediate, irreparable harm Plaintiffs will suffer absent injunctive relief.

---

[3] Plaintiffs do not claim that cash deposits would constitute irreparable harm, but Plaintiffs state that "[m]ost growers simply cannot satisfy the very stringent requirements adopted for bonding. Therefore, their importers will have to comply with any cash deposit requirements."  <u>See</u> Pls.' Reply 4, fn. 6; <u>see also</u> TRO and PI Hr'g Oral Argument at 19:05, May 16, 2019, ECF No. 25 ("We can get back our cash deposits – that's a financial remedy.  We're not concerned about that.").

In regard to the loss of export volume, Plaintiffs submitted, *inter alia*, the declarations of

Mr. Diaz, Mr. Valdez, and Mr. Manson.  Mr. Diaz, the Director of AMHPAC, stated that 46

percent of AMHPAC's membership did not have a bond in place, 24 percent of AMHPAC's

membership had "experienced moderate to severe disruption in their normal business

operations," 43 percent of AMHPAC's membership had reduced shipments to the United States,

and 10 percent of AMHPAC's membership stopped shipping to the United States.  Diaz Decl.

¶¶ 1–5.  Mr. Valdez, the President of CABC, stated that 89 percent of the tomato producers in

CABC's membership have not been able to secure bonds required for import into the United

States, 21 percent of CABC's membership stopped shipping to the United States, and some of

CABC's members are unable to renew lines of credit from those businesses' "long-standing"

lenders in Mexico.  Valdez Decl. ¶¶ 1–4.

Mr. Manson is President of Pacific Brokerage Company, Inc. and a licensed Customs

broker.  Manson Decl. ¶ 1.  Mr. Manson declared that he processes the Customs entries for

twelve of the "largest" Mexican tomato growers and helps those entities to secure the required

bonds and accounts to process payments of cash deposits.  Id. at ¶ 2.  Mr. Manson stated that

"[c]ollateralization of either or both bonds is extremely difficult in the current environment of

very high tariffs on many products" and that "[t]he surety my company uses for bonds has

required 100% collateral for all except one company."  Id. at ¶¶ 3–4.[4]  Mr. Manson also declared

that based on Mr. Manson's conversations with other Customs brokers, Mr. Manson

---

[4] In supplemental briefing, Defendant clarifies that Customs "currently requires either a bond or
a cash deposit."  Def.'s Suppl. Br. 3 (emphasis removed); see also Def.'s Suppl. Br. Ex. 1, ¶ 1,
May 17, 2019, ECF No. 28–1 ("As a result, the suspension of liquidation on Fresh Tomatoes
from Mexico is reinstated and cash deposits or the posting of a bond equal to the estimated
margins listed in Paragraph 3 below are now required.").

"understand[s] that about one-third of Mexican growers have reduced volumes and the remaining

two-thirds have stopped shipping."  Id. at ¶ 5.

Plaintiffs' evidence fails to connect the cash deposit or bond requirement and the

attendant circumstances of that requirement with specific and substantiated information

regarding the ultimate consequences to Plaintiffs' business operations.  Plaintiffs' evidence is

unspecific regarding the nature and consequences of the business disruptions.  Upon review of

all Plaintiffs' evidence concerning the loss of export volume, the court concludes that Plaintiffs

have not met their burden to show how loss of export volume constitutes irreparable harm.  See

also Harmoni Int'l Spice, 41 CIT at __, 211 F. Supp. 3d at 1307 (discussing that loss of business

may be irreparable harm if it would deprive the movant of meaningful judicial review).

Second, the court considers Plaintiffs' assertions as to loss of goodwill and loss of

business opportunities.  In support, Plaintiffs offered, *inter alia*, the declaration of Mr. Jamie

Chamberlain, the President of Chamberlain Distributing Inc. ("Chamberlain Distributing"),

which is an importer of Mexican tomatoes, and the declaration of Mr. Escalante, the Director of

CAADES's Vegetable Division, as well as the declaration and testimony of Mr. Ley.

Chamberlain Decl. ¶ 1; Escalante Decl. ¶ 1; see TRO and PI Hr'g Oral Argument at 40:27–

40:45; Ley Decl. ¶ 10.  Mr. Chamberlain stated that the implementation of a 17.56 percent cash

deposit duty on fresh tomatoes from Mexico caused his company to stop importing Mexican

tomatoes.  Chamberlain Decl. ¶¶ 1–3.  As an example of lost business opportunities, Plaintiffs

offer that Chamberlain Distributing had contracts with customers to receive tomatoes until the

end of May, and that as a result, Chamberlain Distributing had to cancel those commitments.  Id. at ¶ 6.[5]

Mr. Escalante stated that 33 percent of CAADES's membership "experienced difficulties" securing bonds required to import fresh tomatoes into the United States, 21 percent of CAADES's membership reduced shipments to the United States, 23 percent of CAADES's membership stopped shipping to the United States and ended their export season two months early, and 43 percent of CAADES's membership was "in high risk of losing their contracts." Escalante Decl. ¶¶ 1–5.

Mr. Ley testified that he believed that for every ten contracts held by Mexican tomato producers, he estimated that four were being re-negotiated and six were being terminated as parties to the contracts sought "escape" clauses or were "walking away" from the contracts.  See TRO and PI Hr'g Oral Argument at 40:27–40:45; Ley Decl. ¶ 10.  Mr. Ley noted that these contractual relationships take years of work for businesses to obtain certification and qualification with buyers.  See TRO and PI Hr'g Oral Argument at 40:45–41:18.  Mr. Ley also stated that tomato growers who import 15 loads or less of fresh tomatoes per week account for approximately 90 percent of the Mexican tomato growers, and that Mr. Ley believed that many growers who import 15 loads of fresh tomatoes per week are unable to secure a bond.  See TRO and PI Hr'g Oral Argument at 40:27–40:45; Ley Decl. ¶ 4.[6]

---

[5] The court notes that neither Mr. Chamberlain nor Chamberlain Distributing Inc. is a Plaintiff or Plaintiff-Intervenor in this action.

[6] Plaintiffs submitted two pieces of documentary evidence as attachments to Mr. Ley's declaration: (1) a Reuters article to support Mr. Ley's statement that "bonding requirements have surged since the Trump Administration's imposition of tariffs on imports of steel and aluminum, as well as most imports from China" and (2) a letter to Secretary Ross from a Mexican government official.  Declaration of A. Martin Ley, Exs. 1 & 2, May 15, 2019, ECF Nos. 23–2 & 23–3.

The court finds that Mr. Escalante's concern that CAADES's membership is "in high risk of losing their contracts" is too uncertain to show that such a consequence will occur absent a TRO or PI, and Mr. Escalante's concern is not sufficiently supported by Plaintiffs' other evidence.  Mr. Ley's testimony that at least some percentage of contracts are being re-negotiated also suggests that at least some industry participants are seeking interim solutions, which weighs against Plaintiffs' contention of irreparable harm.  The court concludes that Plaintiffs' evidence regarding loss of goodwill and loss of business opportunities is insufficient and too speculative to meet Plaintiffs' burden regarding irreparable harm.

Fourth, the court considers Plaintiffs' assertions regarding market disruptions and disruptions in the supply chain.  Pls.' Reply 2–3.  In support, Plaintiffs submit, *inter alia*, a memorandum from Dr. Timothy J. Richards and a University of Arizona Study Summary.  The first exhibit is Dr. Richards' memorandum, which discusses the economic impact of restricting tomato imports into the United States.  Richards Mem. 1–3.  Dr. Richards' memorandum discusses a study that attempts to model the possible price effects assuming various reductions in tomato supply from Mexico.  Id.  Dr. Richards' memorandum states that "[t]erminating the suspension agreement will reduce the supply of tomatoes in the [United States] market, and raise prices paid by consumers in the [United States], particularly during the winter tomato season (October - June).  The exact extent of these effects depends on the sensitivity of prices to changes in supply."  Richards Mem. 1.

In considering Dr. Richards' memorandum, the court notes that Dr. Richards' memorandum appears to be written in Dr. Richards' capacity at Badger Metrics, LLC, to the President of the Fresh Produce Association of the Americas.  Dr. Richards did not appear in person to testify before the court about his memorandum.  Plaintiffs did not provide Dr.

Richards' *curriculum vitae* or any other information that provides context as to the preparation of

Dr. Richards' memorandum.  See Koslowe Decl. (May 9, 2019).[7]  It is not clear from the record

whether Dr. Richards participated in the study discussed in the memorandum, whether Dr.

Richards is merely summarizing the results of another entity's study, or if Dr. Richards is

conducting an analysis based on a model or data from another entity.  Without further record

evidence or the testimony of Dr. Richards, the court cannot assess whether the discussion and

conclusions in Dr. Richards' memorandum are valid or reliable.  See generally Fed. R. Evid.

702.  The court concludes that Dr. Richards' memorandum adds little weight to Plaintiffs'

arguments regarding irreparable harm.

Plaintiffs also submitted a two-page summary of a study conducted by the University of

Arizona, which discusses the contribution of Mexican fresh tomatoes to the United States

economy.  See University of Arizona Study Summary.  Plaintiffs proffer that the court may infer

from Dr. Richards' Memorandum and the University of Arizona Study Summary that "the

broader U.S. economy would suffer significant harm if Commerce imposes duties" and "[t]he

reduction in imports that will be caused by the termination of the agreement, as modeled in the

ASU study, would have a clear disruptive impact throughout the supply chain."  Koslowe Decl.

(May 9, 2019), ¶¶ 6–7.[8]

---

[7] It is not clear from the record before the court whether either or both of Dr. Richards'
memorandum and the University of Arizona Study Summary was prepared in anticipation of
litigation.

[8] Defendant argues that because Mr. Koslowe is the Plaintiffs' attorney and offers only
speculative allegations of harm, the Koslowe Declaration (May 9, 2019) is weak evidence.  See
Def.'s Resp. 10–14.  Defendant argues also that "the declaration and attachments focus primarily
on the effect of a reduction in Mexican tomatoes to United States customers and not the
immediate harm to the [P]laintiffs."  Id. at 13.

As an example, Plaintiffs submitted the declaration of Mr. Mojardin, the Research

Programs Coordinator at CAADES.  Mojardin Decl. ¶ 1.  Mr. Mojardin declared that he visited a

Walmart Supercenter in Foothills Mall in Tucson, Arizona on May 10, 2019, and that the store

had no tomatoes from Mexico on display.  Id. at ¶ 3.  Mr. Mojardin reports that he asked two

store clerks if there was a specific reason as to why the store did not have any tomatoes, and a

store clerk replied that he did not have any information.  Id. at ¶ 5.  In the absence of a sufficient

causal connection between the shortage of tomatoes asserted in Mr. Mojardin's declaration and

the alleged irreparable harm from the Government's withdrawal from the suspension agreement

and resumption of the investigation at issue in this case, the court does not draw any inference

regarding irreparable harm from Mr. Mojardin's example.

Defendant counters that Plaintiffs presented no evidence that Commerce's instructions,

issued after a party's withdrawal from the 2002, 2008, and 2013 Suspension Agreements, caused

widespread disruption in the fresh tomato market.  See Def.'s Suppl. Br. 4, May 17, 2019, ECF

No. 28.

Plaintiffs' motion for a TRO and PI also addresses the burden incurred by the

requirement to collect and submit data in relation to the expedited continued investigation over a

period of weeks versus a period of months.  Pls.' Mot. for TRO and PI 7.[9]  The court concludes

---

[9] Pls.' Mot. for TRO and PI 7 ("Commerce's announced actions also will impose an immediate and significant burden on the Mexican Growers by forcing them to submit data in a few short weeks that normally is collected over several months."); but see Pls.' Reply at 4–5 ("CAADES is not complaining about submitting data to Commerce pursuant to a timely antidumping investigation.  Instead, CAADES submits that it is irreparably harmed by Commerce's unlawful action in treating its outdated preliminary determination of 1996 'as if' it were made on May 7, 2019, and forcing respondents, including CAADES, to submit entirely new information for individual companies still to be selected so that Commerce can make a final determination on that new data in a few short weeks.").

that Plaintiffs have not sufficiently shown that the burdens identified by Plaintiffs support a

determination of irreparable harm.

Although the court acknowledges the potential disruptions to the fresh tomato market and

supply chain alleged by Plaintiffs in this matter, the court concludes that Plaintiffs' evidence fails

to meet the high burden required to show irreparable harm and that injunctive relief is warranted.

Plaintiffs' evidence, when viewed in its totality, is insufficient to support a determination of

irreparable harm absent injunctive relief.

### C.  Balance of Hardships

Plaintiffs contend that the balance of hardships tips in Plaintiffs' favor because Plaintiffs

"face irreparable harm" and argue that their requested injunction would maintain the *status quo*.

Pls.' Mem. 10 (discussing the balance of the equities).  Defendant disputes Plaintiffs' assertions

of irreparable harm and argues that Plaintiffs have no vested right to import merchandise into the

United States, that the United States may suffer hardship in the collection of duties, and that

Plaintiffs suffer no hardship by being subject to "an ordinary consequence of the statutory

scheme." Def.'s Mem. 25.  Defendant-Intervenor adds that the domestic industry would suffer

hardships if an injunction were granted and argues that the hardships to Defendant and the

domestic industry outweigh Plaintiffs' hardships.  See FTE's Resp. 22–23.[10]

When assessing the balance of hardships, the court must "balance the competing claims

of injury and must consider the effect that granting or denying relief would have on each party."

Winter, 555 U.S. at 24.  The court notes that Plaintiffs' requested injunctive relief would exceed

---

10 FTE argues that the harm to the domestic industry is discernable based on the conclusions of
the final determination of the Sunset Review regarding the 2013 Suspension Agreement.  FTE's
Resp. 22; see also Fresh Tomatoes From Mexico, Final Results of the Full Sunset Review of the
Suspended Antidumping Duty Investigation, 83 Fed. Reg. 66,680, 66,681 (Dep't Commerce
Dec. 27, 2018).

the *status quo*. Plaintiffs seek to enjoin Commerce from ordering suspension of the liquidation

of entries of fresh tomatoes from Mexico, resuming its antidumping investigation, and

instructing U.S. Customs and Border Protection to require a cash deposit or bond for each entry

of tomatoes. Pls.' Mot. for TRO and PI 1. Each of the actions challenged by Plaintiffs is

required under 19 U.S.C. §§ 1673b and 1673d, thus issuance of the requested relief in an

injunction would suspend the effect of the statute in this matter. The court determines that

Defendant and Defendant-Intervenor would face hardship as a result of the injunction. Absent

further justification by Plaintiffs, the balance of the hardships tips in favor of denying Plaintiffs'

motion.[11]

### D. Public Interest

Plaintiffs argue that a TRO or PI is in the public interest because the public interest is

served by ensuring compliance with Commerce's governing statutes and regulations, and

Plaintiffs believe that Commerce's actions will have a negative effect on consumers and the

economy. Pls.' Mem. 10–11. Defendant counters that an injunction does not serve the public

interest because an injunction would encourage circumvention of antidumping and

countervailing duties investigations, would provide Plaintiffs prematurely with the advantages of

a final favorable adjudication of the action, and would not serve the public interest by providing

a supply of fresh tomatoes from Mexico. Def.'s Resp. at 26–27. Defendant-Intervenor adds that

the public interest is best served by the effective enforcement of the trade laws, including the

resumption of a suspended antidumping duty investigation and correct collection of antidumping

---

[11] Even if Plaintiffs could meet their burden to establish irreparable harm, in the context of the balance of hardships, Plaintiffs' alleged hardships would not rise to the level to tip the balance of the hardships in favor of granting the requested injunctive relief.

duties.  FTE's Resp. at 23–24.  The public interest is neutral and does not favor one party or another.

### IV.    Conclusion

The court has subject-matter jurisdiction under 28 U.S.C. § 1581(i).  In consideration of Plaintiffs' motion for a TRO and PI, the court determines that Plaintiffs have not met their burden to establish a likelihood of success on the merits and irreparable harm absent injunctive relief, the balance of the hardships tips in favor of denying Plaintiffs' motion, and the public interest is neutral.  Plaintiffs' motion for a TRO and PI is denied.

An order will issue accordingly.

                                                      /s/ Jennifer Choe-Groves
                                                  Jennifer Choe-Groves, Judge

Dated:      June 6, 2019
              New York, New York